661 F.2d 436
 9 Fed. R. Evid. Serv. 533
 UNITED STATES of America, Plaintiff-Appellee,
v.
Howard "Sonny" HAWKINS, Roger G. Beckman, William D. "Bill"
McCain, George Rawls, a/k/a Howard Kenith Leigh,
Ned Ames, Jorge Luis Valdes, James
Patrick Herman, Defendants-Appellants.
 No. 80-7140.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit B*
 Nov. 16, 1981.
 R. David Botts, Atlanta, Ga., for Hawkins.
 Walter L. Brady, Jr., Robert J. Hanlon, St. Louis, Mo., for Beckman.
 Charles H. Stegmeyer, Belleville, Ill., for McCain.
 John R. Martin, Atlanta, Ga., for Rawls.
 Al Horn, Atlanta, Ga., for Ames.
 Shelby Highsmith, Miami, Fla., Martin G. Weinberg, Boston, Mass., Brayton Dasher, Macon, Ga., for Jorge Luis Valdes.
 Donald L. Wolff, Clayton, Mo., for Herman.
 Richard Nettum, William P. Adams, Macon, Ga., for plaintiff-appellee.
 Appeals from the United States District Court for the Middle District of Georgia.
 Before GEWIN**, RONEY and HATCHETT, Circuit Judges.
 RONEY, Circuit Judge:
 
 
 1
 On this consolidated appeal seven defendants, jointly tried before a federal jury, challenge their convictions for drug conspiracy. The defendants raise numerous points of error, including the composition of the grand and petit juries, restrictions on cross-examination, prosecutorial misconduct, Brady violations, judicial bias, denial of a bill of particulars, sufficiency of the indictment and evidence, the denial of severance, improper comments of a codefendant's attorney, admissibility of evidence obtained through an allegedly illegal search, and mistreatment in a foreign country. Having carefully considered the extensive trial record and the legal arguments made on appeal, we conclude no reversible error has been shown. The convictions are affirmed.
 
 
 2
 Although the facts are treated in greater detail later in the discussion of the specific issues raised on appeal, an overview will be useful. The record evidence, viewed most favorably to the Government,[1] describes a large drug conspiracy operating in 1978 and 1979. The object of the conspiracy was the importation from South America of substantial quantities of three controlled substances, marijuana, methaqualone and cocaine, for distribution and sale in the United States. Private planes were used in the operation.
 
 
 3
 The leaders of the conspiracy over its entire duration were George Rawls, an appellant here, and Harold Rosenthal, who pled guilty prior to trial and is not a party to this appeal. Rosenthal supervised the smuggling aspect of the operation, while Rawls generally handled the distribution and sale of incoming drug shipments. The other defendants played various subsidiary roles.
 
 
 4
 A grand jury in the Middle District of Georgia handed down a five-count indictment in July 1979. Twenty persons were charged in the first count with conspiracy to import drugs.[2] Eleven of the twenty were also charged in the second count for conspiracy to possess with intent to distribute drugs.[3] Rosenthal and Rawls were charged in the third and fourth counts, respectively, with operating a continuing criminal enterprise.[4] The final count was severed before trial and is not involved on this appeal. Appellants here were charged with one or more of these counts. The specific charges against each will be set forth in the separate treatment given to each of their appeals.
 
 
 5
 Eleven of those charged in the indictment were tried jointly before a jury. The Government's case rested in large part on the testimony of five witnesses. Four had been pilots in the drug operation while the fifth had been Rosenthal's bodyguard and aide. All five had been immunized in exchange for their testimony. The remaining witnesses and exhibits presented by the Government basically corroborated the activities of the conspiracy.
 
 
 6
 After a lengthy trial, the jury returned a guilty verdict against seven defendants: Rawls, Ned Ames, Jorge Luis Valdes, William McCain, James Herman, Howard "Sonny" Hawkins, and Roger Beckman. The other four defendants were acquitted, one by the trial court on a directed verdict. The seven convictions form the basis of this appeal.
 
 
 7
 Five of the seven defendants filed briefs and participated in oral argument before this Court. Counsel for all defendants, including those who chose not to otherwise participate, have adopted by reference all relevant arguments made by other counsel. F.R.A.P. 28(i). Whether or not indicated further in this opinion, each error asserted by a defendant has been considered where appropriate as applicable to the other defendants. For purposes of discussion, we first address the issues which could affect all the convictions presented for review. We then discuss issues applicable only to individual defendants.
 
 Composition of Grand and Petit Juries
 
 8
 Defendants argue the procedures by which the grand and petit juries were selected resulted in a geographic imbalance on the grand jury and racial and sexual imbalance on both juries, in violation of federal law and the Fifth and Sixth Amendments of the Constitution. After a two-day hearing on the claims, the district court upheld the legality of the selection process. United States v. Rosenthal, 482 F.Supp. 867 (M.D.Ga.1979).
 
 
 9
 A description of the disputed selection process would be helpful in understanding the issues. As explained by the trial court, the Middle District of Georgia is composed of 70 of Georgia's 159 counties and is statutorily divided into seven divisions: Albany, Americus, Athens, Columbus, Macon, Thomasville and Valdosta. Following the passage of the Jury Selection and Service Act of 1968,[5] the active judges of the Middle District adopted a plan for random jury selection, which was approved administratively, but not judicially, by a Reviewing Panel comprised of judges of this Court. The plan is supervised by the clerk of the district court.
 
 
 10
 Pursuant to the plan, voter registration lists are obtained from each county every four years immediately following the presidential election. The jury wheels involved in this case were constituted after the 1976 election. In order to obtain a sufficiently large master and qualified wheel, the clerk randomly selected 2,500 names from each of the Albany, Americus, Athens, Thomasville and Valdosta divisions, and 5,000 names from each of the Columbus and Macon divisions. The names so selected became the Master Jury Wheel. The clerk then sent a questionnaire to each person on the wheel, seeking responses that would either qualify, exempt, or excuse prospective jurors.
 
 
 11
 From the responses to the completed questionnaires, the clerk determined those persons who were qualified to serve as jurors. Computer cards containing the names of these persons were placed in a box which became the Qualified Jury Wheel. It is from this wheel that the grand and petit juries were selected.
 
 
 12
 Under the plan, grand juries were selected from the entire district. The plan provides that the clerk shall select a grand jury venire "by drawing a pro rata, or approximately pro rata, number of names at random from the qualified jury wheels of each division in the district." The clerk interpreted "pro rata" to mean that the number of names selected should be in proportion to the size of the master and qualified wheels so that the Macon and Columbus Divisions should have twice as many names in the grand jury venire as the other five divisions. The selection of the grand jury venires was conducted as follows: the qualified boxes from all seven divisions were gathered in open court and the clerk or his designee blindly drew one name each from the Albany, Americus, and Athens Divisions' boxes, two names from the Columbus and Macon Divisions, and one name each from the Thomasville and Valdosta Divisions so that nine names were selected. This process was done in rotation five times until 45 names were drawn ten names each from Columbus and Macon and five names each from the other divisions. From this venire the first 23 names of those who had not been excused for hardship or removed because of death or other reasons were chosen by the court to serve as grand jurors.
 
 
 13
 Persons for the petit juries were selected randomly from the qualified box. The number of jurors for a particular venire was determined by the court and memorialized in an order to the clerk to draw that number of prospective jurors.
 
 
 14
 In challenging this selection process, defendants first contend an unlawful statistical disparity existed between the racial and sexual composition of the Master and Qualified Jury Wheels and the composition of these elements in the general population of the district. In Duren v. Missouri,[6] the Supreme Court held a defendant's right to a jury selected from a fair cross-section of the community is violated when there is a systematic disproportion between the percentage of a "distinctive" group in the community and its representation in venires from which the juries are selected. The Court set forth the following three-part test for establishing a violation:
 
 
 15
 In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.[7]
 
 
 16
 While it is undisputed that the allegations concerning race and sex satisfied the first element of a prima facie case, defendants have failed to satisfy the remaining elements. They concede the selection process is random and objective, but argue the statistical disparity establishes a prima facie violation. The trial court, however, found the underrepresentation of women and blacks on the qualified jury wheel to be only 1.75 and 5.45 percent, respectively. 482 F.Supp. at 872-73. These disparities fall well within the limits set forth by the Supreme Court and in this Circuit.[8] The trial court did not err in concluding defendants failed to make out a case of a constitutionally impermissible proportion based on race and sex.
 
 
 17
 Defendants next contend the manner in which the grand juries are selected does not assure that each county in a division is "substantially proportionally represented," as required by the Jury Selection and Service Act.[9] They argue grand jurors must be chosen by a "mathematically proportionate method," in which the number of grand jurors from a county is in direct proportion to the number of the county's registered voters.
 
 
 18
 In response, the Government contends that in addition to showing a geographic imbalance, defendants must establish that county residents form a "cognizable" group under the Act. We need not decide this issue, because the record indicates the counties were substantially proportionally represented.
 
 
 19
 According to the uncontested findings of the trial court, on an average panel of 23 grand jurors the Macon division will be underrepresented by approximately 2 jurors, while the Columbus division will be overrepresented by only 1.5 jurors. The remaining divisions would reflect a disparity of 1 or less jurors.[10] We agree with the district court these statistics indicate that while the current method is not mathematically perfect, it does assure substantially proportionate representation. The figures are similar to those in United States v. Maskeny,[11] in which this Court upheld a selection process which resulted in one division in the district having three fewer seats on the grand jury than its population would warrant. Moreover, as in Maskeny, defendants "fail to show the impact of this alleged misallocation of seats on representation of the particular groups on the jury list."[12]
 
 
 20
 Defendants' final contention is that the composition of the grand and petit juries was unlawful because registrars in two counties in the district violated the Voting Rights Act of 1965.[13] Defendants allege the registrars removed names from the county voter registration lists, from which the Master Wheel was compiled, in violation of section 1973e(d)(2). This section provides that "a person whose name appears on such a list shall be removed therefrom by an examiner if ... he has been determined by an examiner to have lost his eligibility under State law ...."[14] While defendants concede the reasons the names were removed under state law were valid, they argue only the federal examiners had the power to remove the names.
 
 
 21
 We need not decide whether the county registrars violated this provision of the Voting Rights Act. Even assuming a violation, defendants fail to show how this violation resulted in racially or sexually-imbalanced juries, or had any other discriminatory impact. Any potential effect on the pool of potential jurors is countered by defendants' concession the voters were removed from the list for legitimate reasons under state law, primarily for failing to vote in the preceding three years. Moreover, the number of persons removed from the lists in these two counties represented a statistically insignificant percentage of the total voters in the district. Defendants have not cited to this Court any cases holding such a violation of the Voting Rights Act requires a finding of an unlawful jury selection process, and we decline to reach this conclusion here.
 
 Restrictions on Scope of Cross-Examination
 
 22
 Defendants challenge several restrictions placed by the trial court on the scope of cross-examination of the key Government witnesses. The standard of review for this challenge is well established. A trial court, based upon its sound discretion, may limit the scope and extent of cross-examination, and its decision will not be disturbed on review unless an abuse of discretion is present. This discretion, however, is limited by a defendant's right of cross-examination sufficient to satisfy the confrontation clause of the Sixth Amendment.[15] The inquiry, then, is whether the trial court's restrictions impermissibly interfered with the Sixth Amendment rights of the defendants or were otherwise so prejudicial as to result in an abuse of discretion.[16]
 
 
 23
 The trial court refused to permit defense counsel to cross-examine Norris Reed and Newton Coley about their postindictment arrests. Reed and Coley were pilots who had participated in the drug conspiracy. During the trial, counsel obtained information from the State Department indicating Reed and Coley had been arrested twice outside the country by foreign authorities. The first arrest took place in Curacao in November 1979 for operating an aircraft without adequate personnel. Reed and Coley were soon released on that charge, apparently because of insufficient evidence. The second arrest occurred in Colombia a month later for violating Colombian airspace. They were released only after payment of a fine and confiscation of their aircraft. Defense counsel sought to cross-examine Reed and Coley concerning these arrests primarily to show bias, on the theory the Government may have assisted the pair in their release in exchange for their testimony against defendants, and also to impeach Reed, who had testified he had not been out of the country since his release from prison in March 1979.[17]
 
 
 24
 There was no evidence the Government assisted the pair in any way in connection with their release on the foreign charges. The Government specifically denied such assistance and defense counsel presented no evidence to the contrary. Moreover, both Reed and Coley had agreed to testify for the Government against defendants well before these foreign arrests. The trial court did not err in restricting this line of inquiry concerning possible bias.
 
 
 25
 The initial questioning of Reed as to whether he had been out of the country since March 1979 was irrelevant and collateral to the main issues in the case. There is no right to impeach a witness with respect to collateral or irrelevant matters.[18] The trial court's refusal to permit defense counsel to impeach Reed's false answer to this question with evidence of the arrests was therefore not error.
 
 
 26
 Defendants next challenge restrictions on the cross-examination of Verne Voll and J. D. Scarborough, two other pilots in the conspiracy, with respect to the conditions of the Panamanian jails in which they were imprisoned at the time they agreed to testify for the Government. They had been detained by Panamanian authorities in April 1979, following the crash of their plane in that country. A substantial quantity of cocaine was found aboard the plane. After discussion with agents of the United States Drug Enforcement Agency (DEA), Voll and Scarborough agreed to testify against defendants in exchange for immunity and assistance in their release from prison. Defense counsel argue the prison conditions reflect on the state of mind of the pair at the time they agreed to testify, which was relevant to the issue of bias and motivation.
 
 
 27
 The trial transcript indicates the court permitted both Voll and Scarborough to be fully cross-examined about their state of mind during their imprisonment in Panama, and the effect of this confinement on their decision to cooperate with the DEA. Scarborough also was cross-examined to some extent about prison conditions in Panama, in particular with respect to an instance of brutality he allegedly witnessed.[19] The jury, then, was adequately apprised of the pair's state of mind at the time they agreed to testify. The trial court did not err in limiting further inquiry into details of the conditions of the Panamanian jails.
 
 
 28
 Defendants' third challenge is to the limits placed on the questioning of Scarborough with regard to whether he had assisted the DEA in other cases since his return from Panama. Defense counsel again contend this information was relevant to show bias or allegiance to the DEA. The transcript, however, reveals there was adequate cross-examination about his alleged involvement with the DEA:
 
 
 29
 Q. You stated the income you received in regards to this case, did you receive any other income at all for informing for any law agency at all, state level or other?
 
 
 30
 A. I have not.
 
 
 31
 Q. Have you sought to work directly with the DEA?
 
 A. I have not.[20]
 
 32
 In addition, the Government informed the court and defense counsel that its records indicated Scarborough had not worked with the DEA other than in this case.[21] In light of the lack of any evidence to the contrary, the trial court did not err in restricting further inquiry into Scarborough's alleged DEA activities.
 
 
 33
 As to cross-examination, defendants finally contend the court erred in not permitting defense counsel to ask the key Government witnesses whether they were aware of the maximum sentences for the first two counts of the indictment, with which they might have been charged had they not been immunized. Counsel argue this questioning was for the purpose of showing bias and motivation of the witnesses by demonstrating the value of the bargain gained by virtue of their cooperation with the Government. The trial court refused to permit this line of questioning on the grounds the potential sentences the witnesses could have received was in the discretion of the sentencing court, and in any event there was no evidence the maximum sentences were discussed as part of the bargain.
 
 
 34
 We need not decide whether the restriction on this inquiry was error, although an earlier decision by this Court suggests defense counsel should have had the opportunity to at least inquire whether maximum sentences had been discussed by the witnesses and the prosecution.[22] The jury here was made aware of the potential sentences through the counsel's questions,[23] the court's response,[24] and the closing arguments.[25] As this Court held in a similar situation:
 
 
 35
 The jury was adequately, if not conventionally, advised about the maximum penalty that (the witness) could have feared. Despite the intervention of the trial judge, the primary impeaching material was presented to the jury.[26]
 
 
 36
 This restriction by the trial court, therefore, presents no reversible error.
 
 
 37
 We note in summary the trial transcript indicates all five key Government witnesses were cross-examined at length about the bargains struck with the Government in exchange for their testimony. The jury was fully informed of each witness' possible bias and motivation for testifying. In light of this extensive cross-examination, we cannot say the trial court abused its discretion in limiting at times the scope of questioning with respect to bias.[27]
 
 
 38
 Alleged Prosecutorial Misconduct and Brady Violation
 
 
 39
 Defendants' next two challenges are closely related. They concern the foreign arrests of Reed and Coley, discovered by defense counsel through documents obtained from the State Department during trial. First, defendants contend the failure of the prosecution to disclose information about these arrests prior to trial violated Brady v. Maryland.[28] Second, defendants argue the prosecution engaged in misconduct by allowing perjured testimony by Reed, who testified he had not been out of the country since March 1979. The State Department documents indicate this testimony was false. In Brady, the Supreme Court held "the suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[29] Napue v. Illinois[30] and its progeny hold "a conviction obtained by the (Government's) knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."[31]
 
 
 40
 Defendants concede the prosecution team had no actual knowledge of the foreign arrests or the State Department documents, but contend such knowledge should be imputed.[32] We need not decide this issue. Assuming the prosecution knew of these arrests, defendants fail to satisfy the "materiality" requirement necessary to support either a Brady violation or a charge of prosecutorial misconduct. Defense counsel's only intended use of information about the arrests was to show bias and to impeach Reed. As discussed earlier, however, the trial court did not err in excluding cross-examination about the arrests for either of these purposes.[33] Even if the information could have been introduced in some way by defense counsel, it is doubtful whether it would have affected the jury verdict. As the Supreme Court has noted:
 
 
 41
 The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.[34]
 
 
 42
 In light of the cumulative nature of Reed's testimony, the minor importance of the information about the arrests, and the entire record concerning guilt, the Government's failure to disclose the arrests was not reversible error.
 
 Refusal to Hold a James Hearing
 
 43
 Defendants challenge the trial court's decision not to hold a hearing pursuant to United States v. James[35] to determine the admissibility of coconspirator statements. Under James, decided by this Court sitting en banc, a coconspirator's hearsay statement is not admissible unless the trial court determines the Government has established by a preponderance of the evidence independent of the statement itself that a conspiracy existed, that the coconspirator and the defendant against whom the statement is offered were members of the conspiracy, and that the statement was made during the course of the conspiracy. The Court in James held that a hearing on this issue was preferred but not required:
 
 
 44
 The district court should, whenever reasonably practicable, require the showing of a conspiracy and of the connection of the defendant with it before admitting declarations of a coconspirator. If it determines it is not reasonably practical to require the showing to be made before admitting the evidence, the court may admit the statement subject to being connected up.[36]
 
 
 45
 In the present case the trial court, after reviewing the Government's investigative file and the applicable law, held a James hearing was not reasonably practicable. It therefore admitted the statements subject to being connected up.[37] The prosecution, however, agreed to structure its order of proof to make an independent showing of a defendant's connection to the conspiracy before offering a coconspirator's statement implicating the defendant.[38]
 
 
 46
 Given the sheer volume of the evidence as well as the large number of Government witnesses, the trial court reasonably concluded the holding of a separate James hearing was impracticable. Through its examination of the investigative file, the court was in a position to review the Government's independent evidence supporting the admissibility of the coconspirator statements. This case is similar to United States v. Ricks,[39] in which the trial court's decision not to hold a James hearing was upheld, because the court had become familiar with the Government's evidence from presiding over earlier trials of other members of the same conspiracy. We conclude the trial court did not err in declining to hold a hearing in this case.
 
 
 47
 Defendants, in particular Ned Ames, also contend the trial court erred in concluding the Government had offered substantial evidence to support the admission of the coconspirator statements. This finding by the court is a factual determination which is subject to the "clearly erroneous" standard of review.[40] Upon review of the record, we cannot say the court clearly erred in this determination.
 
 Judicial Bias and Interference
 
 48
 Defendants contend they received an unfair trial on the ground the trial court demonstrated prejudicial bias in favor of the Government throughout the entire proceedings. They cite numerous examples of allegedly prejudicial conduct by the judge, including the extensive questioning of defense witnesses, the cutting off of defense counsel, and the creation of a generally "intimidating atmosphere."
 
 
 49
 While a trial judge, of course, has "a duty to conduct the trial carefully, patiently, and impartially,"[41] the judge has wide discretion in managing the proceedings:
 
 
 50
 (A) federal judge is not a mere moderator of proceedings. He is a common law judge having that authority historically exercised by judges in the common law process. He may comment on the evidence, may question witnesses and elicit facts not yet adduced or clarify those previously presented, and may maintain the pace of the trial by interrupting or cutting off counsel as a matter of discretion. Only when the judge's conduct strays from neutrality is the defendant thereby denied a constitutionally fair trial.[42]
 
 
 51
 A careful review of the lengthy transcript in this case indicates that while the trial judge played an active role, his overall management of the proceedings was within the bounds of permitted conduct. The judge's continuous and aggressive efforts to maintain control over the month-long trial were not surprising in light of the number of defendants and defense counsel, as well as the volume and complexity of the evidence. The court did not limit its admonishments to defense counsel, as defendants contend, but chided the prosecutor on several occasions for various conduct. In fact, the court at one point threatened the prosecutor with contempt for what it believed to be unnecessary delay in turning over certain documents to defense counsel.[43] Moreover, most of the court's arguments with counsel took place during bench conferences, out of the hearing of the jury.
 
 
 52
 At the beginning of trial and again in its final instructions, the court cautioned the jury:
 
 
 53
 During the course of a trial I occasionally make comments to the lawyers or ask questions of a witness or admonish a witness concerning the manner in which he should respond to the questions of counsel. Do not assume from anything I may have said that I have any opinion concerning any of the issues in this case. Except for my instructions to you on the law you should disregard anything I may have said during the trial in arriving at your own findings as to the facts.[44]
 
 
 54
 We conclude defendants did not receive an unfair trial.
 
 
 55
 Defendants cite to several adverse legal rulings by the court to support their argument of bias and prejudicial conduct by the trial judge. Without addressing these numerous objections in detail, we find no reversible error.
 
 GEORGE RAWLS
 
 56
 Count IV of the indictment charged Rawls, also charged in other counts, with operating a "continuing criminal enterprise" in violation of 21 U.S.C.A. § 848. For a person to operate a continuing criminal enterprise within the meaning of section 848, he must act "in concert with five or more other persons" and with respect to those persons he must occupy a "position of organizer, a supervisory position, or any other position of management."[45] Count IV did not name the persons whom Rawls allegedly supervised.[46] Rawls contends the trial court erred in denying his motion for a bill of particulars seeking these names.
 
 
 57
 The purpose of a bill of particulars is to inform the defendant of the charge against him in sufficient detail and to minimize surprise at trial. The denial of a bill rests within the sound discretion of the trial court and can be reversed only when it is established that defendant was actually surprised at trial and thus incurred prejudice to his substantial rights.[47] While the indictment in this case could have been more specific, it adequately put Rawls on notice of the persons the Government would claim he supervised. The indictment contained a detailed list of overt acts in which Rawls and Rosenthal were named as central figures. The list also contained the names of the codefendants as well as those who ultimately became the key Government witnesses. It is these persons who were alleged by the prosecutor in his opening argument as those supervised by Rawls and Rosenthal. Rawls has failed to show he was surprised at trial by the persons listed in the indictment and alleged by the prosecutor.
 
 
 58
 This Court addressed a similar situation in United States v. Johnson,[48] in which the indictment charging a section 848 violation also did not specify the names of the persons allegedly supervised by defendants. Defendants were later informed by the prosecutor only that these persons would include "four Spanish-surnamed individuals as well as other persons unnamed at that time."[49] This Court upheld the denial of the bill of particulars, holding defendants had not shown they were surprised or misled at trial.[50]
 
 
 59
 In light of the sufficiency of the indictment and the lack of a showing of surprise or prejudice, we hold the trial court did not abuse its discretion in denying the motion for a bill of particulars.
 
 NED AMES
 
 60
 Ames was indicted only in Count I for conspiracy to import drugs, and found guilty by the jury. Ames first challenges the sufficiency of the evidence implicating him in the conspiracy. The standard of review for this claim is "whether the jury might reasonably conclude that the evidence, viewed in the light most favorable to the prosecution, is inconsistent with every reasonable hypothesis of the accused's innocence."[51]
 
 
 61
 The evidence established that Ames, a pilot and airplane mechanic, owned a small, unattended air strip in Florida known as "Ames Field." In September 1978, Rosenthal and pilot Norris Reed used a hanger at Ames Field to remove the seats from a plane in preparation for smuggling. Rosenthal paid Ames for the use of this hangar.
 
 
 62
 After the crash of this plane in South America, Ames agreed to purchase a new plane for Rosenthal. He subsequently found and purchased a Beechcraft Queenair for Rosenthal, paying for it with a $75,000 draft drawn on a bank in the Bahamas. Approximately one month earlier, Ames had recruited a pilot, Verne Voll, for Rosenthal.
 
 
 63
 Voll and another pilot involved in the conspiracy, J. D. Scarborough, later flew the plane to Ames Field, where they removed the seats and installed equipment designed to increase its flying range. Scarborough, one of the Government's key witnesses, testified that on this occasion:
 
 
 64
 Mr. Ames was inquiring as to the size of the bales of marijuana so that we could determine how many bales we could put into the plane below the window area and forward of the entry door and rear of the entry door so that upon exit and entry of the plane, anybody standing on the ground outside couldn't see what was in it.[52]
 
 
 65
 The Government also established that Rosenthal had paid Ames a substantial amount of money for the use of his field and for various work on the plane, and that numerous telephone calls in connection with the conspiracy were made to and from Ames Field.
 
 
 66
 Although Ames admits the use of his field and hangars by the conspirators, his purchase of the plane and recruitment of Voll, and the work he performed on Rosenthal's planes, he contends these were all legal activities and that he had no knowledge of the drug conspiracy. He disputes Scarborough's testimony implicating him as "uncorroborated and inherently unreliable."
 
 
 67
 The evidence, as summarized above, was sufficient for the jury to conclude Ames had knowledge of and participated in the conspiracy to import drugs. It was up to the jury to determine whether Scarborough's testimony, perhaps the most damaging evidence, was credible.[53] Ames' counsel as well as other defense counsel vigorously cross-examined Scarborough in an attempt to discredit his testimony, but apparently did not succeed.
 
 
 68
 Ames also contends the court erred in denying his motion for severance. He argues that since the evidence against him was de minimis in relation to the evidence against the other defendants, there was a real danger of a prejudicial "spillover" effect. This argument fails, however, in light of evidence sufficient to implicate Ames in the conspiracy. Any spillover effect is countered by the fact three of Ames' codefendants were acquitted by the jury, which indicates an apparent careful weighing of the evidence against each defendant. The trial court did not abuse its discretion in denying the severance motion.
 
 WILLIAM McCAIN
 
 69
 McCain was indicted and found guilty on Counts I and II of the indictment for conspiracy to import and possess drugs with intent to distribute. McCain challenges the sufficiency of the evidence to support his conviction.
 
 
 70
 The evidence, viewed most favorably for the Government,[54] derived largely from the testimony of Scarborough. It established that McCain managed a nightclub in Lebanon, Illinois. One day in November 1978, Rawls and Scarborough met with McCain at his home and later at the nightclub. That evening, McCain and Scarborough drove to an airport in St. Charles, Missouri. Scarborough testified that while at the airport, he and McCain set up an antenna for the purpose of radioing an airplane that was expected to arrive with a large load of marijuana. Although they waited all night, the plane did not arrive and the two finally left. They later discovered they had been waiting at the wrong airport and the plane had arrived at another airport in the vicinity that evening.
 
 
 71
 After leaving the airport, McCain stopped in St. Charles to make a telephone call. Scarborough testified that McCain told him he had called Rawls, who reportedly said the load was already in and was presently stored in a nearby warehouse. That evening, Scarborough and Rawls met McCain at his nightclub, where McCain handed to Rawls a suitcase he had taken out of the office safe. Scarborough later discovered the suitcase contained a large sum of money. McCain reportedly also told Scarborough he had placed a bale of marijuana in the van Scarborough and Rawls planned to drive that night to Georgia.
 
 
 72
 McCain argues that even if Scarborough's testimony was credible, it was insufficient to show he had knowledge of or had participated in the drug conspiracy. He contends that apart from Scarborough's hearsay testimony on what McCain had told him, evidence of McCain's presence at the airport and the handing over of the suitcase to Rawls reasonably suggests he may have been a mere "errand boy" without further knowledge of the conspiracy.
 
 
 73
 Upon review of Scarborough's testimony and other evidence against McCain, it appears the jury could reasonably conclude McCain knew of and participated in the conspiracy. Even though the evidence indicated his involvement in only one drug transaction, the law is clear that:
 
 
 74
 (C)onduct consisting only of involvement in a single transaction may nevertheless be treated as rationally permitting the inference of knowledge of the broader conspiracy where the single act itself shows so much familiarity with or high-level participation in the overall conspiracy as to be in and of itself indicative of the broader conspiracy.[55]
 
 
 75
 McCain's knowledge of the broader conspiracy could be inferred from his awareness of the use of private planes in the operation, his personal contact with Rawls and his involvement with additional members of the conspiracy. We hold the evidence was sufficient to support his conviction.
 
 
 76
 McCain next contends the indictment was insufficient because it failed to allege an overt act by him in furtherance of the conspiracy. This Court has held, however, that an indictment charging a violation of 21 U.S.C.A. § 846 or its sister statute § 963 "is sufficient if it alleges a conspiracy to distribute (or import) drugs, the time during which the conspiracy was operative and the statute allegedly violated, even if it fails to allege or prove any specific overt act in furtherance of the conspiracy."[56] The indictment in this case met the above requirements and was therefore sufficient.
 
 JAMES HERMAN
 
 77
 Herman, convicted on the first two counts of the indictment, argues a single point of error relating to statements made by a codefendant's attorney during his closing argument. George Rawls' counsel argued in closing to the jury:
 
 
 78
 I will argue to you something I don't think you would expect from a defense attorney, especially when his client is charged with serious crimes but what I will argue to you this morning is the evidence in this case and my belief that this evidence shows that my client is, in fact, guilty of Count Two of the indictment.
 
 
 79
 He is, however, not guilty of Count One and Count Four.[57]
 
 
 80
 Counsel's strategy apparently was to concede the Count II conspiracy with intent to distribute charge and concentrate on preventing a conviction on the more serious Count IV charge, which alleged Rawls was supervisor of a continuing criminal enterprise. Herman contends these statements amounted to a "confession" by Rawls that a conspiracy did exist, which therefore incriminated the codefendants. Since Rawls did not testify and could not be cross-examined, Herman argues his rights under the Confrontation Clause of the Sixth Amendment were violated.[58]
 
 
 81
 Herman's characterization of the statements as a "confession" by Rawls is misleading. Counsel did not state that Rawls admitted his guilt or the existence of a conspiracy, but instead only indicated it was his belief the evidence was sufficient to establish Rawls' guilt on the second count. Counsel's statements, then, while perhaps questionable,[59] did not trigger the Confrontation Clause of the Sixth Amendment. Moreover, the trial court gave a cautionary instruction concerning these and other statements by counsel:
 
 
 82
 Remember that any statements, objections, or arguments made by the lawyers are not evidence in the case. The function of lawyers is to point out those things that are most significant or most helpful to their side of the case. And in so doing to call your attention to certain facts of inferences that might otherwise escape your notice. In the final analysis, however, it is your own recollection and interpretation of the evidence that controls in the case. What the lawyers say is not binding upon you. When an attorney in behalf of his client states that you should find his client guilty of a particular charge such a statement is not evidence and is not by itself sufficient for you to base a finding of guilty on. Such a statement does not relieve you of your duty to determine whether or not in truth and fact and under these instructions the defendant is guilty of what his lawyer suggests he is guilty of.[60]
 
 
 83
 In view of this cautionary instruction, we cannot say the trial court erred in declining to grant a mistrial on the basis of counsel's statements.
 
 JORGE LUIS VALDES
 
 84
 Valdes was convicted on Count I of the indictment for conspiracy to import drugs. He offers three grounds of appeal.
 
 Incidents in Panama
 
 85
 Valdes' first ground of appeal arises from his allegations of brutal treatment by Panamanian authorities and their illegal search of a plane on which he was a passenger following its crash in Panama. Arguing the United States Government should be held responsible for the actions of the Panamanians because of their involvement in the incidents, Valdes contends the court should have dismissed the indictment against him on the basis of the mistreatment or, at the least, suppressed the evidence obtained from the search and the testimonial fruits derived therefrom, in particular the trial testimony of pilots Scarborough and Voll.
 
 
 86
 The trial court held a lengthy hearing on Valdes' claims, in which testimony was presented by Valdes, two of his companions on the plane, and the Panamanian and American authorities involved. This testimony established that on April 26, 1979, a private plane carrying Valdes made a crash landing on a rural airstrip in Panama. Rosenthal, Voll and Scarborough were also on the plane. The DEA, whose El Paso Intelligence Center had been keeping track of this plane because of its suspected drug activities, informed Panamanian authorities of the crash. Since the plane was disabled, the four passengers departed for a nearby village, where they were later arrested. A search of the plane by Panamanian authorities pursuant to a Panamanian search warrant uncovered "three cases full of cocaine," as well as additional suitcases and briefcases containing various documents.
 
 
 87
 During the next two weeks, the four were transferred to a jail in Panama City and interrogated by both Panamanian and DEA agents. They were also visited on several occasions by the American consul in Panama. It is during this period that Voll and Scarborough agreed to testify for the Government in exchange for immunity and assistance in their release from prison. Scarborough and Voll were permitted to leave the country on May 4. Rosenthal and Valdes were deported five days later, and were immediately arrested upon their arrival in the United States.
 
 
 88
 With respect to the allegations of an illegal search, the general rule is that the Fourth Amendment does not apply to arrests and searches made by foreign authorities in their own country and in enforcement of foreign law. Two exceptions to this rule are recognized: first, if the conduct of the foreign authorities in conducting the search "shocks the conscience" of the American court; and second, if American officials participated in the foreign search, or if the foreign authorities were acting as agents for their American counterparts.[61]
 
 
 89
 Neither of these exceptions is applicable here. There are no circumstances surrounding the search which shocks the conscience. The search of the plane was carried out pursuant to a Panamanian search warrant and there is no evidence any subsequent search of the occupants was conducted in an unacceptable manner. The evidence also failed to establish a level of American participation in the search that would trigger the application of the Fourth Amendment. Valdes concedes the DEA agents did not participate in the actual search. There is no indication the DEA agents persuaded the Panamanian authorities to conduct the search on their behalf in an attempt to evade the strictures of the Fourth Amendment. American involvement was limited to notifying Panamanian authorities that a plane suspected of carrying drugs had made a crash landing in their country. This case is similar to United States v. Morrow,[62] where this Court held that a similar notification of foreign authorities was insufficient to invoke the exclusionary rule.[63]
 
 
 90
 With respect to the charge of mistreatment, a careful review of the testimony and other evidence indicates the trial court was not clearly erroneous in finding that Valdes failed to prove his claim. The Panamanian authorities and DEA agents involved in the interrogations of the four passengers vigorously denied any mistreatment. Voll and Scarborough also denied any personal mistreatment. They indicated that while prison conditions in Panama were not altogether comfortable, they were adequately housed and fed. They testified that prior to interrogation they were advised of their rights by the American consul and the DEA agents.
 
 
 91
 The only evidence in support of Valdes' claim was his own testimony and that of an attorney who met him upon his return to the United States. The attorney testified he noted bruises on Valdes' face. The American consul who saw Valdes in Panama as well as others who met him upon his return to this country, however, testified that Valdes did not complain at the time of any mistreatment and that they witnessed no physical signs of abuse. The trial court did not err in denying Valdes' motion to dismiss the indictment or to exclude the evidence seized from the plane.
 
 Overbroad Theory of Conspiracy
 
 92
 Valdes does not seriously deny he was involved in a conspiracy to import cocaine. He contends, however, his conspiracy was separate from the Rosenthal-Rawls conspiracy involving the importation and sale of marijuana and methaqualone, and that he used the Rosenthal-Rawls network only to smuggle his cocaine into the United States. He therefore argues the evidence failed to establish the existence of a single, broad conspiracy involving the sale of all three drugs, as charged in the indictment.
 
 
 93
 The evidence presented by the Government established that in April 1979, Valdes met with Rosenthal, Voll and Scarborough in Miami to plan a trip to Bolivia to purchase a large amount of cocaine for distribution in the United States. Later that month, Valdes flew to Bogota, Colombia from Miami where he again met Rosenthal, Voll and Scarborough, who had flown in on a private plane. Valdes accompanied them on a five-day trip through Central and South America until they arrived in Lima, Peru. He then left them to take a commercial flight to Santa Cruz, Bolivia, to make final arrangements for the purchase of the cocaine. When the other three arrived in Santa Cruz, the cocaine was loaded into the private plane and they took off to return to the United States. The plane, however, crashed in Panama which resulted in the arrests of all four occupants and the confiscation of the cocaine, as described more fully in the preceding section.
 
 
 94
 Whether a scheme is one conspiracy or several is primarily a question for the jury.[64] The evidence in this case established that Valdes tied into the existing Rosenthal-Rawls conspiracy for the purpose of importing cocaine into the United States. The jury could reasonably conclude from this evidence both that a single broad conspiracy existed and that Valdes had knowledge of the larger conspiracy. The Second Circuit, in considering a heroin conspiracy, noted: "(I)t would be unrealistic to assume that major producers, importers, wholesalers or retailers of drugs do not know that their actions are inextricably linked to a large on-going plan or conspiracy."[65] The fact that Valdes was not involved in transactions of other drugs by the Rosenthal-Rawls network does not counter the existence of a single conspiracy or his involvement therein. This Court has held:
 
 
 95
 A finding of a single conspiracy is not defeated merely because of personnel changes. On the contrary, we have recognized proof of overlapping membership and activities directed toward a common goal as factors reflecting only one conspiracy.[66]
 
 
 96
 The conspiracy alleged in this case involved at varying times shipments of marijuana, methaqualone, and with Valdes, cocaine. Although there were some changes in personnel from transaction to transaction, the conspiracy was supervised throughout its entire duration by the same two persons, and retained as its general object the importation of drugs from South America. We therefore conclude the jury reasonably found a single conspiracy of which Valdes was a participant. Because of this holding, it is not necessary to address Valdes' related contention of lack of venue in the Middle District of Georgia.
 
 
 97
 Valdes also challenges the trial court's instructions concerning the issue of single versus multiple conspiracies. Without reviewing these instructions in detail here, we find that when read as a whole they were adequate to inform the jury of the proof required to establish a single conspiracy.[67]
 
 Denial of Motion for Severance
 
 98
 Valdes contends the trial court erred in denying his motion for a severance. He argues it would have been "extremely simple" and would have "created no impediment to judicial economy" to try him separately.
 
 
 99
 The granting or denial of a motion for severance is in the discretion of the trial court, and appellate courts are hesitant to second guess a trial court's refusal to grant a severance.[68] The joint trial of Valdes with his codefendants resulted in a significant judicial economy because of the overlap of evidence and testimony. Valdes does not show any undue prejudice from being jointly tried. The trial court did not abuse its discretion in denying severance.
 
 HOWARD HAWKINS and ROGER BECKMAN
 
 100
 As noted earlier, counsel for Hawkins and Beckman did not file separate briefs or participate in oral argument before this Court. All counsel concurred in the arguments advanced by other counsel to the extent they were relevant to their clients. Accordingly, with respect to Hawkins and Beckman, the arguments of others having failed to prevail, we note only that we have reviewed the evidence implicating them in the conspiracy, and conclude it was sufficient to support their convictions.
 
 
 101
 AFFIRMED.
 
 
 
 *
 Former Fifth Circuit case, Section 9(1) of Public Law 96-452 October 14, 1980
 
 
 **
 Due to his death on May 15, 1981, Judge Gewin did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. § 46(d)
 
 
 [1]
 See, e. g., Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942)
 
 
 [2]
 21 U.S.C.A. § 963
 
 
 [3]
 21 U.S.C.A. § 846
 
 
 [4]
 21 U.S.C.A. § 848
 
 
 [5]
 28 U.S.C.A. §§ 1861 et seq
 
 
 [6]
 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979)
 
 
 [7]
 Id. at 364, 99 S.Ct. at 668
 
 
 [8]
 See, e. g., Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); United States v. Goff, 509 F.2d 825 (5th Cir.), cert. denied, 423 U.S. 857, 96 S.Ct. 109, 46 L.Ed.2d 83 (1975); Thompson v. Sheppard, 490 F.2d 830 (5th Cir. 1974), cert. denied, 420 U.S. 984, 95 S.Ct. 1415, 43 L.Ed.2d 666 (1975)
 
 
 [9]
 See 28 U.S.C.A. § 1863(b)(3). This section provides in pertinent part:
 (b) Among other things, such (juror selection) plan shall
 (3) specify detailed procedures to be followed by the jury commission or clerk in selecting names from the sources specified in paragraph (2) of this subsection. These procedures shall be designed to ensure the random selection of a fair cross section of the persons residing in the community in the district or division wherein the court convenes. They shall ensure that names of persons residing in each of the counties, parishes, or similar political subdivisions within the judicial district or division are placed in a master jury wheel; and shall ensure that each county, parish, or similar political subdivision within the district or division is substantially proportionally represented in the master jury wheel for that judicial district, division, or combination of divisions.
 
 
 [10]
 For a 45-person grand jury venire, the composition would be as follows:
 Mathematically
 Proportionate Current (k) Over representation
 Division Method Method (-) Underrepresentation
----------- -------------- ------- -----------------------
Albany 5 5 0
Americus 4 5 k1
Athens 7 5 -2
Columbus 7 10 k3
Macon 14 10 -4
Thomasville 4 5 k1
Valdosta 4 5 k1
 -------------- -------
 45 45
 The disparity figures for a 23-person grand jury panel would be approximately half those indicated in the last column above.
 
 
 [11]
 609 F.2d 183 (5th Cir.), cert. denied, 447 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980)
 
 
 [12]
 Id. at 191. See also United States v. Foxworth, 599 F.2d 1, 4 (1st Cir. 1979)
 
 
 [13]
 42 U.S.C.A. §§ 1973 et seq
 
 
 [14]
 42 U.S.C.A. § 1973e(d)(2) (emphasis supplied)
 
 
 [15]
 United States v. Ramirez, 622 F.2d 898, 899 (5th Cir. 1980). See also Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)
 
 
 [16]
 United States v. Vasilios, 598 F.2d 387, 390-91 (5th Cir.), cert. denied, 444 U.S. 967, 100 S.Ct. 456, 62 L.Ed.2d 380 (1979)
 
 
 [17]
 Reed testified during cross-examination:
 Q. Have you violated the conditions of your parole since you were released in March of '78 (sic)?
 A. No sir.
 Q. Have you left the country without permission since that date?
 A. No sir.
 Tr. V, pp. 113-14.
 
 
 [18]
 See, e. g., United States v. Nace, 561 F.2d 763, 770-71 (9th Cir. 1977); United States v. Cochran, 499 F.2d 380, 391 (5th Cir. 1974), cert. denied, 419 U.S. 1124, 95 S.Ct. 810, 42 L.Ed.2d 825 (1975)
 
 
 [19]
 During cross-examination, Voll testified in pertinent part as follows:
 Q. Were you afraid that you would never get to see (your family) again if you didn't cooperate?
 A. It entered my mind, yes.
 Q. Were you afraid you would never get to see the United States again if you did not cooperate?
 A. Right.
 Q. Afraid you might die in Panama if you didn't cooperate?
 A. Correct.
 Q. Afraid you might be tortured in Panama if you didn't cooperate?
 A. Correct.
 Q. And did you think that the only people that could help you get out of Panama was Agent Dempsey and the United States Drug Enforcement Agency? Is that correct?
 A. At the time I felt like that, yes.
 Q. And you felt if you didn't cooperate with them all those things that you were afraid of might happen to you?
 A. Yes sir. Right.
 Q. Do you recall Mr. Valdes coming to you while you were in jail in Panama and saying he had heard a guard say if you people thought the Midnight Express was bad you should wait until you see the Panamanian jails?
 A. That's correct.
 Q. Do you remember the Midnight Express was a movie about brutality in Turkish jails where an American prisoner was brutalized and went insane?
 A. That's right.
 Q. You were afraid of that happening to you if you didn't cooperate with the United States Drug Enforcement Administration, weren't you?
 A. Yes.
 Q. From everything you heard about jails in Panama you were afraid they might even forget you there and leave you to rot there, weren't you?
 A. Right.
 Q. You were afraid they might even shoot you because you had no legal rights. Is that right?
 A. That's right.
 Tr. VII, pp. 103-04.
 Scarborough was also cross-examined on his state of mind as well as about prison conditions:
 Q. Hadn't you suffered during those seven days in the Panama jail?
 A. Yes sir.
 Q. Weren't you afraid of being physically harmed in the Panama jail?
 A. No sir.
 Q. Did you just see an act of brutality committed right in front of your eyes for the purposes of showing you what could happen to you?
 A. I thought it was a sham.
 Q. You thought it was a sham done for your benefit? Right?
 A. That's correct.
 Q. To show you what could happen to prisoners who don't cooperate? Right?
 A. To try to scare us. Yes sir.
 Q. Scare you. That's why they had a naked man out in front of you, to scare you. Is that right?
 A. That's correct.
 Q. Kicked him in front of you to scare you. Is that right?
 A. They did not kick him.
 Q. Rather than kick, sir, I was mistaken. What happened were that people were stepping on his toes and he was punched in the back while he was naked on the floor. Is that right?
 A. That's correct.
 Q. That was done on May 3, 1979 in Panama City during the time that you were in Latinez' office and the day before you made the statement to the DEA in writing in the hotel. Is that right?
 A. That's correct.
 Q. Sir, is it not a fair statement that from the conversation that you had with the American consul and from what you heard from Agent Sedillo that you feared the system of justice that was in Panama?
 MR. NETTUM: Objection to the form of the question.
 THE COURT: He may answer that.
 A. No, I did not.
 Q. You had no fear of it?
 A. No sir.
 MR. MARTIN: Your Honor
 THE COURT: You may go ahead.
 Q. Is it not true that Mr. McLean and Agent Sedillo told you that
 MR. NETTUM: Objection to what Mr. McLean and Agent Sedillo told him.
 THE COURT: He may go ahead and ask him about it.
 Q. That in Panama they have a Napoleonic code and one of the things about the Napoleonic code is that as opposed to America where you are presumed innocent until proven guilty, in Panama you are presumed guilty until you prove yourself innocent. Is that not true? Did he not tell you that?
 A. That's correct.
 Q. Didn't that raise some fear in your mind?
 A. No, it didn't. May I explain?
 Q. Yes.
 A. Consul also advised us that it was very hard to get a conviction on smuggling into Panama.
 Q. He also told you, though, did he not, that you would be held incommunicado until you made a statement?
 A. That is correct.
 Q. No one would know whether you were alive or dead or where you were until you made a statement? He told you that? That was the law of that country?
 A. That's correct.
 Q. So you knew that your friends and your family wouldn't know a thing about you until you made a statement. You knew that, didn't you?
 A. I knew that to be the law, yes sir.
 Q. And the American consul told you there was nothing he could do about that, did he not tell you that?
 A. That's correct.
 Q. And even though he knew you were there he couldn't notify your family because he was bound by Panamanian law. Is that not correct?
 A. That is correct.
 Q. The consul did tell you that you were in pretty serious trouble at that time, did he not?
 A. Yes sir.
 Q. And you might serve up to eight years for the offense. Is that correct?
 A. That's correct.
 Q. Now you stayed in Panamaian jails, I think you went to the city of David, that was your next transport, to the city of David. Is that correct?
 A. That's correct.
 Q. And you stayed in that jail that jail was a pretty crude jail. Is that not correct?
 A. That's correct.
 Tr. VIII, pp. 177-79; 224-27.
 
 
 [20]
 Tr. IX, p. 34
 
 
 [21]
 The chief prosecutor stated to the court and defense counsel:
 Mr. Weinberg (a defense counsel) indicated that he had some basis for believing that Mr. Scarborough was or might be a confidential informant. I will state for the record as follows Your Honor, you will see it when I give you the DEA 6's on Mr. Scarborough that at the time Mr. Scarborough was arrested in Panama and a debriefing began, DEA, as is the custom in such cases, assigned a confidential informant or cooperating individual number to Mr. Scarborough. He has got a CI number at the DEA. He has not been, to my knowledge or to the knowledge of Mr. Dempsey (a DEA agent), and I can put Mr. Dempsey on the stand and he will so testify, he has not been a CI in any other case. He is not presently working for the Drug Enforcement Administration. Mr. Dempsey went on Thursday when this question first came up, he contacted headquarters in Washington and asked them to assess the computer and see if there were any CI numbers besides ours in the computer that was connected to the witness Scarborough in any way and it came back negative, there was not. But there is that one CI number and it is a matter of routine practice that they would assign a number to him.
 Tr. IX, pp. 4-5.
 
 
 [22]
 See United States v. Benavides, 549 F.2d 392, 394 (5th Cir. 1977). See generally United States v. Mayer, 556 F.2d 245 (5th Cir. 1977)
 
 
 [23]
 The following took place before the jury during the cross-examination of Newton Coley, one of the key Government witnesses:
 Q. MR. MARTIN: Isn't it true you knew the maximum penalty for Count One is 15 years in the penitentiary?
 MR. NETTUM: Your Honor, I object and ask the witness be instructed to not answer the question.
 THE COURT: Well, what relevance does that have, gentlemen? If the bargain is that he is not going to be prosecuted at all. Do you want to argue about how good the bargain is?
 MR. MARTIN: Your Honor, I am saying what considerations got out of the bargain. He had a potential 15 year sentence for one and
 MR. NETTUM: Your Honor, please, I object to that. May we approach the Bench?
 THE COURT: You may.
 Tr. III, p. 246.
 
 
 [24]
 After sustaining an objection to the above questioning on maximum sentences, the court remarked to the jury:
 THE COURT: Ladies and gentlemen of the jury, you will recall when the Court first explained to you ladies and gentlemen how this case was going to proceed, that the Court in essence told you that under the laws passed by Congress it is the responsibility of the judge of every United States court as to anyone who has been convicted of any crime to determine that the sentence is, and that that is not a function of the jury. Because of that, that you yourself in determining guilt or innocence should not give any consideration to what the possible penalty might be, if you find somebody guilty.
 Now in this instance the witness has testified that the United States agreed that if he testified he would not be prosecuted for the charges for which all of these other people are being prosecuted. There is no question about the fact that the charges are felonies and are very serious crimes. The defense counsel has the right to go fully into that bargain. Every phase of it. What was said and what was done. Any agreements, favors, promises, it doesn't matter what it is. In the Court's best judgment there is no foundation under the evidence for there to be any inquiry and argument about what Congress says the maximum possible penalty might have been had this gentleman been tried. In other words, if he didn't take the bargain and if he was tried and convicted. There has been no evidence that such a discussion was a part of the bargain. If it had been he could go into it. So the Court instructs you that while it has been mentioned that so far there is no basis for that to be now argued about or inquired into further by counsel. The Court is not going to let counsel go any further into the subject.
 Tr. III, pp. 251-52.
 
 
 [25]
 In closing arguments, defense counsel told the jury with respect to one of the Government witnesses:
 Mr. Trammel told you he knew that the penalty on Count Two was five years and the penalty on Count One is fifteen years.... So you decide to become a Government witness.... He is going to avoid the exposure to the fifteen year count and he is also still to be sentenced by the Court and he wants the Government to tell the Court how much help he had been, and even minimize that five years and maybe get probation. That's his motive.
 Tr. XV, p. 57.
 
 
 [26]
 United States v. Onori, 535 F.2d 938, 946 (5th Cir. 1976)
 
 
 [27]
 See, e. g., United States v. Vasilios, 598 F.2d 387, 390 (5th Cir.), cert. denied, 444 U.S. 967, 100 S.Ct. 456, 62 L.Ed.2d 380 (1979); United States v. DeLeon, 498 F.2d 1327, 1332 (7th Cir. 1974)
 
 
 [28]
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)
 
 
 [29]
 Id. at 87, 83 S.Ct. at 1196-97. See also United States v. Anderson, 574 F.2d 1347 (5th Cir. 1978)
 
 
 [30]
 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)
 
 
 [31]
 United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976) (footnotes omitted). See also Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); United States v. Antone, 603 F.2d 566 (5th Cir. 1979)
 
 
 [32]
 See, e. g., United States v. Auten, 632 F.2d 478 (5th Cir. 1980); Martinez v. Wainwright, 621 F.2d 184 (5th Cir. 1980); United States v. Antone, 603 F.2d 566 (5th Cir. 1979)
 
 
 [33]
 See text at notes 17-18, supra. Cf. United States v. Martin, 565 F.2d 362, 364 (5th Cir. 1978) (standard of materiality not met where undisclosed evidence material only for impeachment purposes and not material to guilt or punishment)
 
 
 [34]
 United States v. Agurs, 427 U.S. 97, 112-13, 96 S.Ct. 2392, 2401-02, 49 L.Ed.2d 342 (1976) (footnote omitted)
 
 
 [35]
 590 F.2d 575 (5th Cir.) (en banc), cert. denied, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979)
 
 
 [36]
 Id. at 582
 
 
 [37]
 The trial court ruled:
 The Court has very carefully considered the James case and at this time based upon that determines that it is not reasonably practicable to hold a complete hearing as to who was and who was not in this conspiracy before each and every little tidbit of it is produced. And accordingly will permit the Government to proceed in the manner that James says it may proceed, without making a showing before the evidence being admitted that the peril of the Court acting as James says it shall act in the event that what the Court expects from its examination of the Government's file is to be forthcoming does not come forth.
 Tr. III, p. 123.
 
 
 [38]
 Mr. Nettum, the chief prosecutor, informed the trial court:
 Your Honor, the Government is prepared to offer through this witness and through other witnesses in every situation in preparing a witness for trial we have attempted to limit and intended to limit the out of court statements to two kinds basically. And we feel that the statements are admissible in the following fashion. For example,
 THE COURT: Well, what two kinds first?
 MR. NETTUM: Let me explain. If a witness is on the stand saying I had a conversation with the Defendant George Rawls and he said thus and such, and the thus and such that he said in no way names or incriminates or implicates some other defendant it's admissible against Defendant Rawls. If Mr. Rawls and Mr. Rosenthal and the witness are in a room and statements are made by either Mr. Rawls or Mr. Rosenthal, any statements made by Mr. Rawls are admissible as statements against interest; statements by Rosenthal are admissible against Rawls as statements made in his presence. In no instance do we intend to offer until very, very late in the trial after we have been able to demonstrate some sufficient independent evidence that each and every one of these individuals is a member of the conspiracy then and only then would we offer a statement such as Defendant A and the witness in a conversation with Defendant A saying Defendant B has gone to such and such a place and done thus and such for the purpose of. I know of no other way to do it, Your Honor, except to try the case twice. Once to the Court and once to the jury.
 THE COURT: That sounds reasonable to the Court....
 Tr. III, pp. 133-34.
 
 
 [39]
 639 F.2d 1305 (5th Cir. 1981)
 
 
 [40]
 United States v. Perry, 624 F.2d 29, 30-31 (5th Cir. 1980)
 
 
 [41]
 Herman v. United States, 289 F.2d 362, 365 (5th Cir.), cert. denied, 368 U.S. 897, 82 S.Ct. 174, 7 L.Ed.2d 93 (1961)
 
 
 [42]
 Moore v. United States, 598 F.2d 439, 442 (5th Cir. 1979) (citations omitted)
 
 
 [43]
 The following exchange took place in the judge's chambers concerning the Government's delay in obtaining a rap sheet on one of its witnesses for use by defense counsel:
 THE COURT: Why do you wait until the witness takes the stand gentlemen? This case has been scheduled for months to get a rap sheet.
 MR. NETTUM: Negligence on my part, Your Honor. I will have to take the blame.
 THE COURT: Gentlemen, this is not going to happen again. I thought we had a plain understanding earlier in the week, there is no reason, with the facilities available to you gentlemen, that a rap sheet could not have been available when this man hit that witness stand. And that was the Court's instruction to you. It wasn't to get it this morning, he took the stand yesterday. It doesn't take that long to get a rap sheet. Now one of you better get out of the courtroom and go get it or we are going to start a contempt proceeding here before long. That's not a threat, it's a promise.
 AGENT DEMPSEY: Your Honor, we have three people working on it right now.
 THE COURT: Well you better get four. That would include you.
 Tr. VIII, p. 80.
 
 
 [44]
 Tr. XVII, p. 7. See also Tr. II, p. 54
 
 
 [45]
 21 U.S.C.A. § 848(b)
 
 
 [46]
 Count IV of the indictment provided:
 From on or about May, 1978, and continuously thereafter up to and including the date of this indictment, in the Americus Division of the Middle District of Georgia, and elsewhere, GEORGE RAWLS, A/K/A HOWARD KENITH LEIGH, unlawfully, willfully, and intentionally did violate Title 21, United States Code, Sections 841(a)(1), 846, 952, 960, and 963 as alleged in Counts I and II of this indictment, which are incorporated herein by reference, which violations were a part of a continuing series of violations of subchapters I and II of the Drug Abuse Control Act of 1970, 21 U.S.C. §§ 801, et seq., undertaken by the defendant GEORGE RAWLS and with at least five (5) other persons with respect to whom GEORGE RAWLS occupied a position of organizer, a supervisory position, and a position of management, and from which continuing series of violations the defendant GEORGE RAWLS obtained substantial income and resources of which the United States seeks forfeiture, including all profits obtained by the defendant GEORGE RAWLS in such continuing enterprise and of his interest in, claim against, and property and contractual rights of any kind affording a source of influence over such enterprise; all in violation of 21 U.S.C. § 848.
 R. II, pp. 352-53.
 
 
 [47]
 United States v. Diecidue, 603 F.2d 535, 562-63 (5th Cir. 1979), cert. denied, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980). See also United States v. Johnson, 575 F.2d 1347, 1356 (5th Cir. 1978), cert. denied, 440 U.S. 907, 99 S.Ct. 1213, 59 L.Ed.2d 454 (1979); United States v. Mackey, 551 F.2d 967, 970 (5th Cir. 1977)
 
 
 [48]
 575 F.2d 1347 (5th Cir. 1978), cert. denied, 440 U.S. 907, 99 S.Ct. 1213, 59 L.Ed.2d 454 (1979)
 
 
 [49]
 Id. at 1357
 
 
 [50]
 See also United States v. Howard, 590 F.2d 564, 566-67 (4th Cir.), cert. denied, 440 U.S. 976, 99 S.Ct. 1547, 59 L.Ed.2d 795 (1979); United States v. Sperling, 506 F.2d 1323, 1344 (2d Cir. 1974), cert. denied, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975)
 
 
 [51]
 United States v. Black, 644 F.2d 445, 447 (5th Cir. 1981). See also United States v. Alfrey, 620 F.2d 551 (5th Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 337, 66 L.Ed.2d 160 (1981); United States v. Maner, 611 F.2d 107 (5th Cir. 1980)
 
 
 [52]
 Tr. VIII, p. 50
 
 
 [53]
 See, e. g., United States v. Palacios, 612 F.2d 972 (5th Cir. 1980); United States v. Cravero, 530 F.2d 666 (5th Cir. 1976)
 
 
 [54]
 See text at note 51 supra
 
 
 [55]
 United States v. Torres, 503 F.2d 1120, 1124 (2d Cir. 1974); See also United States v. Consolidated Packaging Corp., 575 F.2d 117 (7th Cir. 1978); United States v. Fontenot, 483 F.2d 315 (5th Cir. 1973)
 
 
 [56]
 United States v. Marable, 578 F.2d 151, 154 (5th Cir. 1978)
 
 
 [57]
 Tr. XV, p. 4
 
 
 [58]
 See Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)
 
 
 [59]
 See, e. g., United States v. Garza, 608 F.2d 659, 662-63 (5th Cir. 1979) (during closing argument attorney may not express his personal opinion on the merits of the case, although he may state his contentions as to the conclusions the jury should draw from the evidence)
 
 
 [60]
 Tr. XVII, pp. 6-7 (emphasis supplied)
 
 
 [61]
 See, e. g., United States v. Heller, 625 F.2d 594, 599-600 (5th Cir. 1980); United States v. Morrow, 537 F.2d 120, 139-40 (5th Cir. 1976); Birdsell v. United States, 346 F.2d 775, 782-83 (5th Cir.), cert. denied, 382 U.S. 963, 86 S.Ct. 449, 15 L.Ed.2d 366 (1965)
 
 
 [62]
 537 F.2d 120 (5th Cir. 1976), cert. denied, 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977)
 
 
 [63]
 Id. at 139-40. See also United States v. Heller, 625 F.2d 594, 599-600 (5th Cir. 1980) (fact that defendant arrested by British on tip from American agents insufficient to establish American participation)
 
 
 [64]
 See, e. g., United States v. Michel, 588 F.2d 986, 995 (5th Cir.), cert. denied, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979); United States v. Rodriguez, 509 F.2d 1342, 1348 (5th Cir. 1975)
 
 
 [65]
 United States v. Arroyo, 494 F.2d 1316, 1319 (2d Cir.), cert. denied, 419 U.S. 827, 95 S.Ct. 46, 42 L.Ed.2d 51 (1974)
 
 
 [66]
 United States v. Ochoa, 609 F.2d 198, 201 (5th Cir. 1980) (emphasis supplied and citations omitted)
 
 
 [67]
 See United States v. DeLeon, 641 F.2d 330, 334-35 (5th Cir. 1981)
 
 
 [68]
 See, e. g., United States v. Horton, 646 F.2d 181, 186 (5th Cir. 1981); United States v. Salomon, 609 F.2d 1172, 1176-77 (5th Cir. 1980)