[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 21, 2009
THOMAS K. KAHN
CLERK

_____

No. 07-15869

_____

D. C. Docket No. 07-00036-CR-5-RS-001

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JUSTIN JEROME SWAINE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(January 21, 2009)**

Before HULL, WILSON and HILL, Circuit Judges.

PER CURIAM:

Justin Jerome Swaine appeals his convictions and 211-month sentences for

conspiracy to distribute more than 1,000 kilograms of marijuana and less than 500

grams of cocaine and possession with intent to distribute more than 50 kilograms of marijuana. After review, we affirm.

## I. DISCUSSION

## A. Indictment and Continuance Motions

A superseding indictment charged Swaine and four others (Carlfred James Anderson, Jose Luis Jorge, Vernon Winston Kevin Henry, Christopher Alexander Artley) with seven drug and firearm counts. Swaine was charged in two drug counts (Counts I and VI) and a firearm count (Count VII): (1) conspiracy to distribute and possess with intent to distribute more than 1,000 kilograms of marijuana and 500 grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(vii), and (b)(1)(B)(ii) and 846 (Count I); (2) possession with intent to distribute more than 50 kilograms of marijuana, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2 (Count VI); and (3) possession of firearms in furtherance of Counts I and VI, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2 (Count VII).

Before trial, the government filed a notice advising the court that, under Bruton v. United States, 391 U.S. 123, 88 S. Ct. 1620 (1968), codefendant Henry had to be tried separately from codefendants Swaine and Anderson because Henry had made post-arrest statements implicating Swaine and Anderson that could not

be redacted. However, the government stated, "There is no <u>Bruton</u> issue between Swaine and Anderson because neither made a post-arrest statement. Accordingly, they may be tried together." The government stated that it preferred to try Swaine and Anderson together for efficiency purposes.

Swaine did not object to being tried jointly with Anderson or file a motion to sever. In his stipulated motion to continue his trial, Swaine recognized, "Co-Defendant Kevin Henry will be tried separately due to a <u>Bruton</u> issue, leaving Defendants Swaine and Anderson to be tried together." (Underline added).

Ultimately, three of Swaine's four codefendants–Jorge, Henry, and Artley–pled guilty to all or part of the charges against them. Anderson pled guilty to Count I in exchange for a dismissal of Count VI. Anderson proceeded to trial on Count VII, along with Swaine on Counts I, VI, and VII. This appeal involves only codefendant Swaine.

## B.     Pre-trial Discussions and Opening Statements

Before <u>voir dire</u>, Swaine's counsel stated, in regard to Anderson, "there may be a problem with some of the anticipated defense that may cause a spillover and possible prejudice to my client on that count." Swaine's counsel referenced potential problems with the introduction of Anderson's plea agreement and stipulation of facts if Anderson was not available for cross-examination and with

3

jury confusion in hearing evidence that the drugs charged in Count VI were found at Anderson's home when Count VI had been dismissed as to Anderson. Anderson's counsel agreed not to reference Anderson's plea agreement or stipulation of facts until his defense case began. Swaine's counsel concluded by saying, "If at some point I feel that my client is going to be overly prejudiced, I may move for a mistrial and move for a severance if that count and that issue comes up . . . ." The district court responded, "We'll take it a step at a time and see how this plays out. Nobody wants to do this twice." Notably, Anderson's counsel did not move for a severance at that time.

During voir dire, the parties and the court discussed how to question the prospective jurors as to whether Anderson's guilty plea on Count I would bias them as to Count VII against Anderson or as to any of pending charges against Swaine. In drafting a question for the potential jurors, the district court wondered aloud "whether any of them can figure out what the hell I'm talking about and whether they can give a meaningful response." The district court asked the potential jurors if any of them believed that they could not fairly judge Anderson or Swaine in light of Anderson's guilty plea on Count I, and none of the potential jurors responded.

Before counsel gave their opening statements, the district court instructed

4

the jury that counsel's opening and closing statements were intended only to help the jury understand the evidence and should not be considered as evidence in the case or instructions on the law.

During its opening statement, the government noted that Anderson pled guilty to a drug conspiracy charge, but this did not mean that he was guilty of anything else. The government further stated that Anderson's guilty plea "certainly doesn't mean Mr. Swaine is guilty. That's what you will determine from the evidence."

During Anderson's opening statement, his counsel conceded that Anderson pled guilty to a drug conspiracy charge (Count I) and noted that the only issue for the jury to decide as to Anderson was whether the firearms seized from his residence were possessed in furtherance of that drug offense (Count VII). Anderson's counsel continued by saying, "In our society most people don't accept responsibility for what they do these days. They've got an excuse for why it shouldn't have happened, why it wasn't their fault. I know that, and I dare say you know that. But Mr. Anderson has accepted his responsibility for what he did wrong."

Anderson's counsel summarized Anderson's story of being a law-abiding citizen until he participated in the drug activity to which he pled guilty. He stated

that Anderson legally purchased the two firearms seized from his vehicles four years before the drug activity began. Anderson's counsel told the jury, "It started, by the evidence in this case, the middle of March of 2007, in which he agreed to store marijuana in his house for someone else." Anderson's counsel said he was paid half the rent in return for storing the marijuana. But Anderson's counsel insisted that the firearms were not in any way used in connection with the criminal activity.

After opening statements concluded, Swaine's counsel asked to approach for a sidebar conference. Swaine's counsel stated to the court:

> As we talked in the previous pretrial, Mr. Anderson's lawyer made a comment that he only stored the drugs in his house for someone else and that he was getting half the rent paid. I don't believe – unless there's a witness the government plans to call to that, I can't cross-examine Mr. Anderson, and I can't cross-examine Mr. Anderson's lawyer. That is thrown out there to the prejudicial effect of my client, and I have no way to confront that.

> And it's a concern that I had that has no bearing on the gun charge, but now there's evidence or the suggestion to the jury that he was holding those drugs for somebody else. That's a charge that he pled to, and that he was getting half of his rent paid. I don't know if the government has a witness who can verify that, other than they're going to use a proffer by Mr. Anderson, and that's improper. And I can't confront that or cross-examine that unless he testifies.

Anderson's counsel stated that no one had been identified by name, and the government commented that Anderson's counsel was "very careful to not speak to

6

any defendants' names." The government stated that it intended to present evidence that people would call Swaine to order marijuana and Anderson would deliver it. The district court stated, "I think we're going to have to take it a step at a time and see who is going to testify on these points." Anderson's counsel again noted that he was careful not to reference Swaine, and the government commented, "I thought it was a nice tapdance." Swaine's counsel responded, "I understand he didn't mention him by name, but the implication is clear." The district court resolved, "I don't see where we can do anything with it now. Let's just see how we go."

## C.    Trial Evidence

The trial evidence established the following. In January 2006, Robert Bondurant was arrested in Texas while transporting two kilograms of cocaine and 257 pounds of marijuana. Bondurant testified that he was transporting the drugs to Florida for Swaine. Bondurant said he was traveling with another woman named Tunesheya who was transporting 142 pounds of marijuana for Swaine that was hidden in a speaker box. Tunesheya dumped the box when she saw the police stop Bondurant, and the police later recovered the box and marijuana.

Bondurant testified that he, Swaine, and codefendant Jorge had been in the marijuana business for six months and had transported 2,000 pounds of marijuana

and some cocaine during that time. According to Bondurant, Swaine had taken control of the operation because he had the money to exploit fully the Texas drug supply connections. Swaine would fly to Texas to buy the drugs and either fly or drive back to Florida separately. Based on information from Bondurant, the police documented several flights by Swaine between Florida and Texas, hotel stays in Texas, and several thousand dollars in rental car receipts.

In February 2006, police stopped a rental truck driven by codefendant Artley based on information provided by Bondurant. Artley consented to a search of the cargo area of the truck, but did not have the key to the padlock. The police cut off the lock, searched the cargo area, and found a backpack containing $91,360 behind furniture. Police separately stopped a vehicle driven by Swaine. Police observed small bits of compressed marijuana throughout the vehicle that was consistent with a vehicle that had been used to transport marijuana. Swaine had a key to a padlock that matched the lock cut from Artley's rental truck.

Codefendant Artley testified that Jorge introduced Artley to Swaine to see if Artley would transport marijuana from Texas to Florida for $5,000 per trip. Artley described each of the four trips he made for Swaine where he transported hidden marijuana. Artley also testified that Swaine gave him ten pounds of marijuana on credit, which Artley failed to pay for, and that he bought five pounds of marijuana

from Jorge, who said he got the marijuana from Swaine.

Codefendant Jorge testified that he bought marijuana from Swaine about 20 times in 2002 and 2003. Jorge and Bondurant made marijuana connections in Texas, but let Swaine take over because he had the money to buy larger amounts. Jorge testified that Swaine would buy hundreds of pounds of marijuana, along with some cocaine, in Texas and have Bondurant or Artley drive it back to Florida. After the police stopped Artley and Swaine, Swaine started paying suppliers to transport the drugs to Florida. Jorge sold several kilograms of cocaine for Swaine. Jorge testified that he also sold some marijuana for Swaine. Jorge said he had received about 500 pounds of marijuana and owed Swaine between $70,000 and $100,000 at the time of his arrest.

Codefendant Henry testified that he initially began selling 15 to 20 pounds of marijuana at a time to Swaine. In August 2005, however, Henry began selling marijuana for Swaine. Henry received about 100 pounds every two weeks from Swaine to sell and sold a total of 1,500 to 1,700 pounds for him. Henry had trouble paying Swaine and owed him $80,000 to $150,000.

After Henry's apartment was burglarized, Henry moved to a house leased by Swaine. Henry was arrested at the house after giving a girlfriend nine pounds of marijuana that had been delivered by Anderson for Swaine. Police searched

Henry's house and recovered a firearm, another half-pound of marijuana, and plastic tubs used for marijuana storage.

Henry testified that codefendant Anderson, who was Swaine's cousin, stored furniture in the house. According to Henry, Anderson was around Swaine constantly, knew of Swaine's business, and sometimes delivered marijuana to Henry for Swaine.

On cross-examination, Alexander's counsel questioned Henry about what he told police about Alexander when he was arrested. Henry testified that he had made some phone calls in search of marijuana and that Anderson had delivered to him ten pounds of marijuana on June 20, 2007. Henry testified that the police later questioned him about Anderson. Henry told them that Anderson was Swaine's cousin, that Henry knew Anderson's girlfriend's nickname, and that he did not know where Anderson lived. Henry also testified that he told the police that it was not the first time that Anderson had delivered marijuana to him.

Anderson's counsel then pointed out that none of the police officers corroborated that testimony. Anderson's counsel also led Henry to admit that he did not mention Anderson when he was questioned by the police on May 4, 2007 about the people he had been involved with in the marijuana business. Anderson's counsel again asked Henry about what he told the police on June 20, 2007, as

follows:

> Q. [B]efore I finish, didn't you say the following, on June 20th, that Anderson lived in the Killian (sic) area with a girl named Neci?
>
> A. I said I didn't know where he lived at. Only thing I knew, he stayed in the Killearn area. That was all I said.
>
> Q. And that you thought that Anderson was possibly storing marijuana for Swaine, right?
>
> A. Yes.
>
> Q. Right?
>
> A. Yes.
>
> Q. And that Anderson probably had the marijuana nearby?
>
> A. Exactly.

Anderson's counsel continued to question Henry as to why he had not mentioned to the police that Anderson had made previous marijuana deliveries to him. Henry insisted that he did not say anything because he was not asked about it. Anderson's counsel also asked Henry why he told police in May 2007 that Swaine would not give him any more marijuana to sell, and Henry said the police must have misunderstood him.

On July 13, 2007, the police executed multiple search warrants. The police searched Swaine's Tharpe Street car wash, carpet cleaning, and window tinting business and recovered twelve pounds of marijuana, scales, and packaging material. The police searched Swaine's mother's residence and recovered twenty pounds of marijuana, blue plastic tubs with marijuana residue, scales, packaging materials, four safes, and $6,000.

11

The police searched Anderson's residence and recovered 144.3 pounds of marijuana, most of which was wrapped in green plastic, multiple sets of scales, packaging materials, and blue plastic tubs. The police also found loaded handguns in each of the two vehicles in the garage and under the bed.

The police searched Swaine's residence and recovered $112,661, primarily from a shoe box in a closet, a .22 pistol, multiple sets of drug ledgers, an ounce of marijuana, six boxes of gallon storage bags, heat seal wrap, and a roll of green plastic (which was similar to the wrapping found at Anderson's residence).

## D.    Closing Statements and Verdict

During closing statements, Anderson's counsel emphasized that Anderson was a low-level participant in the conspiracy, that he had admitted his guilt as to Count I, and that he purchased the firearms long before his involvement in the conspiracy and did not use them in furtherance of the conspiracy. Anderson's counsel summarized the evidence against Anderson, in part, as follows:

> The government has proven that on or about the middle of March–I can actually pinpoint it, March 16th of 2007–a lease was entered into for the residence that Mr. Anderson wound up being in when he was arrested. And where did that leasing company come from? That leasing company was involved with another individual in this case, and you know who I'm talking about.
> And shortly after that new arrangement that Mr. Anderson entered into to live in this new location, Mr. Anderson started storing marijuana for a specific person. And he stored it from times it came in from the middle of March until the middle of July when he got

12

arrested.

> And you know from the evidence that that's really what he did. Because not another person, when they spoke to the police, even referenced C. J. Anderson as being something in March, April, May. It wasn't until June the 20th of 2007 when Mr. Anderson delivered ten pounds of marijuana for someone to Mr. Henry that Mr. Anderson's involvement became clear.

> And that's as the officers testified. And this is a point of contention here. As the officers testified, Mr. Henry believed, thought, it's possible that Mr. Anderson was storing marijuana. That turned out to be true.

Swaine's counsel did not object during or after Anderson's counsel's closing statement that the remarks improperly referenced Swaine.

The district court again instructed the jury that it must consider only the evidence presented in the case and that the lawyers' statements were not evidence. The district court also instructed the jury that Anderson's guilty plea was not evidence of Swaine's guilt.

The jury found Swaine guilty of Counts I and VI and not guilty of Count VII. As to Count I, the jury specifically found that Swaine conspired to distribute or possess with intent to distribute fewer than 500 grams of cocaine and 1,000 kilograms or more of marijuana. As to Count VI, the jury specifically found that Swaine distributed or possessed with the intent to distribute more than 50 kilograms of marijuana. The jury found Anderson not guilty of Count VII.

E.    **Sentencing**

13

The presentence investigation report ("PSI") was prepared on November 5, 2007. The government objected to the PSI's failure to apply a leadership-role enhancement. On December 5, 2007, a revised PSI recommended a four-level leadership-role enhancement, pursuant to U.S.S.G. § 3B1.1(a), and an amended advisory guidelines range of 235 to 293 months' imprisonment.

The sentencing hearing was held on December 12, 2007. The district court asked Swaine's counsel if he had sufficient time to review the PSI with Swaine, and counsel responded that he did. Swaine's counsel stated that he had not received the December 5, 2007 PSI addendum with the government's objection to the lack of a role enhancement until December 10, 2007. Counsel said that he had reviewed the enhancement "briefly" with Swaine and that he could argue Swaine's objection to the enhancement. The government stated that it electronically filed its objection to the PSI on November 16, 2007. Swaine's counsel responded that he did not get a copy of the government's objection. The probation officer stated that the PSI addendum was emailed to both parties on December 7, 2007.

Swaine's counsel later clarified,

Judge, I'm not saying, for the record, that I'm prejudiced, Your Honor, because I think that the testimony at trial, I think, is what happened. I think my client's position is that he didn't exercise control and leadership over these people, but that many of them were independent. And sometimes they would coincide. But I'm not saying, Judge, that I–if I had additional time I would be able to file

14

more than what the facts state in the case. I guess that's what I'm trying to say; I was just trying to note that that's why I didn't file any written objections to that.

The district court found that "it was pretty clear that Mr. Swaine was the person who pulled together this diverse cast of characters" and thus overruled Swaine's objection to the role enhancement. After sustaining Swaine's objection to the two-level firearm enhancement, the district court calculated Swaine's advisory guidelines range as 188 to 235 months' imprisonment.

The district court sentenced Swaine to concurrent sentences of 211 months' imprisonment on Counts I and VI. The district court stated that it imposed a sentence in the middle of the guideline range because of the lack of aggravating and mitigating circumstances and that a 211-month sentence was sufficient.

## II. DISCUSSION

### A.     Confrontation Clause

Swaine argues that codefendant Anderson's counsel made several improper remarks during their joint trial that violated Swaine's Sixth Amendment right to confrontation. Swaine contends that Anderson's counsel, in the course of conducting Anderson's defense, made several statements that implicated Swaine in the drug conspiracy. Swaine argues that Anderson's counsel bolstered his own statements as "the facts" and "the truth" to the point that the statements were

converted to testimony. Thus, Swaine contends that his confrontation rights were violated because he was unable to cross-examine Anderson or Anderson's counsel.[1]

This Court previously concluded in a similar context that counsel's argument to the jury did not trigger a violation of the Sixth Amendment Confrontation Clause. In United States v. Hawkins, 661 F.2d 436, 454 (5th Cir. Unit B Nov. 16, 1981), defendant George Rawls's counsel said during closing argument that he believed the evidence in the case showed Rawls was guilty of the drug conspiracy charge against him, but not guilty of the other charges.[2] Rawls's codefendant argued that counsel's statements amounted to a confession by Rawls that a conspiracy existed, which incriminated the other codefendants, and violated the codefendants' Confrontation Clause rights because Rawls did not testify and could not be cross-examined. Id. This Court described the characterization of counsel's statement as a confession as "misleading" because "[c]ounsel did not

---

[1]On appeal, the government construes Swaine's initial brief to be arguing that Swaine and Anderson had mutually antagonistic defenses that required the district court to sever their trials or declare a mistrial. Swaine's reply brief states that the government has misconstrued his argument and reasserts his Confrontation Clause argument. Swaine likely takes this position because he did not move for a severance or mistrial in the district court based on Anderson's counsel's statements. In any event, we will address only the Confrontation Clause argument raised by Swaine. To the extent Swaine raises any severance issues, we conclude they lack merit.

[2]The decisions of Unit B of the former Fifth Circuit are binding precedent. See Stein v. Reynolds Sec., Inc., 667 F.2d 33, 34 (11th Cir. 1982).

state that Rawls admitted his guilt or the existence of a conspiracy, but instead only indicated it was his belief the evidence was sufficient to establish Rawls' guilt on the second count." Id. The Court said counsel's statements were "perhaps questionable," but "did not trigger the Confrontation Clause of the Sixth Amendment." Id. at 454-455. Furthermore, this Court noted that the district court instructed the jury that the statements, objections, and arguments made by the lawyers in the case were not evidence. Id. at 455.

As in Hawkins, we conclude that codefendant Anderson's statements during opening and closing argument that Anderson was storing marijuana for someone else were not equivalent to testimony against Swaine that violated his Confrontation Clause rights. The district court instructed the jury that Anderson pled guilty to the drug conspiracy and that Anderson's plea did not prove Swaine's guilt in any way. More importantly, the district court instructed the jury that statements and arguments by counsel were not evidence. Like Hawkins, Anderson's counsel's description of his statements as "the truth" or "the facts" may have been improper for opening and closing arguments, but did not transform his statements into testimony under the Confrontation Clause.

As to Anderson's counsel's repetition of Henry's statement to police that he thought Anderson was storing marijuana for Swaine, this statement was made in

17

the context of Anderson's counsel's vigorous cross-examination of Henry as to inconsistencies between his testimony and prior statements to police. Plus, Henry was available for cross-examination by Swaine.[3] The impeachment of Henry favored both Anderson and Swaine.

Thus, we reject Swaine's argument that Anderson's counsel's statements at trial violated his Sixth Amendment confrontation rights and affirm his convictions.

**B.      Swaine's Sentences**

Swaine raises the following three challenges to his 211-month concurrent sentences:  (1) the district court procedurally erred when it did not sua sponte stop the sentencing hearing so Swaine's counsel could discuss the revised PSI and leadership-role enhancement with him;[4] (2) the district court clearly erred by applying the four-level leadership-role enhancement under U.S.S.G. § 3B1.1(a);[5]

---

[3]Although Anderson's counsel questioned witnesses after Swaine's counsel, Swaine's counsel could have at least requested recross-examination of Henry.  The government questioned Henry on redirect, which gave Swaine a chance to recross-examine Henry.  When asked by the district court if Henry could be excused, however, Swaine's counsel said, "We don't need him."

[4]We review sentences under a deferential abuse-of-discretion standard in which we consider (1) whether the district court committed any significant procedural error at sentencing and (2) whether the ultimate sentence imposed is substantively reasonable in light of the totality of the circumstances.  See United States v. Pugh, 515 F.3d 1179, 1189-90 (11th Cir. 2008). "[T]he party who challenges the sentence bears the burden of establishing that the sentence is unreasonable in the light of both th[e] record and the factors in section 3553(a)." United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005).

[5]This Court reviews a defendant's role under U.S.S.G. § 3B1.1 for clear error.  United States v. Ramirez, 426 F.3d 1344, 1355 (11th Cir. 2005).  "For a factual finding to be clearly erroneous, this court, after reviewing all of the evidence, must be left with a definite and firm

18

and (3) his sentences were substantively unreasonable because they were greater than those of his codefendants.

### 1.    Adequate Consultation with Counsel

We reject Swaine's argument that the sentencing court committed procedural error by not continuing the sentencing hearing sua sponte so Swaine's counsel could discuss the leadership-role enhancement with Swaine. The district court asked Swaine's counsel if he had sufficient time to review the revised PSI with Swaine, and counsel said he had. Swaine's counsel advised the court that he had not seen the revised PSI until two days before sentencing, but said he had reviewed the role enhancement "briefly" with Swaine and was ready to argue Swaine's objection to the enhancement. Neither Swaine nor his counsel asked the district court for more time to discuss the role enhancement.

Swaine argues that he was prejudiced by the district court's failure to allow him more time to discuss the role enhancement with his counsel, but does not explain how. In fact, Swaine's counsel explicitly stated otherwise at sentencing. Swaine's counsel told the court, "I'm not saying, for the record, that I'm prejudiced . . . . I'm not saying, Judge, that I–if I had additional time I would be able to file more than what the facts state in the case. . . . I was just trying to note that that's

conviction that a mistake has been committed." United States v. Rodriguez-Lopez, 363 F.3d 1134, 1137 (11th Cir. 2004) (quotation marks omitted).

19

why I didn't file any written objections to that." Swaine's counsel thoroughly argued his objection to the role enhancement at sentencing. Swaine has not identified any arguments that his counsel did not make that could have been discovered if he had more time to discuss the leadership-role enhancement. Thus, the district court did not procedurally err by failing to continue the sentencing hearing sua sponte so counsel could have further discussions with Swaine.

**B.     Leadership-Role Enhancement**

Under U.S.S.G. § 3B1.1(a), a four-level enhancement applies where "the defendant was an organizer or leader of a criminal activity that involved five or more participants." U.S.S.G. § 3B1.1(a). In distinguishing a leadership role, the district court should consider

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

Id. § 3B1.1 cmt. n.4.

The evidence at trial amply supported the leadership-role enhancement. There was evidence that Swaine: (1) was the prominent financier of the marijuana and cocaine conspiracy and made the decisions as to who would transport the drugs and how; (2) hired multiple people to transport hundreds of pounds of drugs

20

and thousands of dollars obtained from selling the drugs between Texas and Florida; (3) traveled separately from the couriers between Texas and Florida; (4) loaned drugs on credit to distributors who sold them for him; and (5) hired multiple people to store and deliver drugs for him. Furthermore, as shown by the amount of assets seized from Swaine, he kept the largest share of the proceeds for himself. Based on this evidence, the district court did not clearly err in applying the four-level leadership-role enhancement.[6] United States v. Suarez, 313 F.3d 1287, 1294 (11th Cir. 2002).

## C. Substantive Reasonableness

We also reject Swaine's argument that his 211-month sentences were substantively unreasonable because his codefendants received lesser sentences than he did. In imposing a reasonable sentence, the district court is required to consider the factors in 18 U.S.C. § 3553(a), which includes "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Swaine's codefendants received imprisonment terms of 23 months (Artley), 41 months (Anderson), 90

---

[6]We reject Swaine's argument that the district court did not have authority to apply the leadership-role enhancement because the jury did not find that Swaine was a leader. A district court has authority to apply an advisory guidelines sentencing enhancement so long as the enhanced sentence does not exceed the statutory maximum for the offenses of conviction. United States v. Hunt, 459 F.3d 1180, 1182 (11th Cir. 2006). Swaine's 211-month sentences were below the statutory maximum of life imprisonment for Count I, 21 U.S.C. § 841(b)(1)(A), and 20 years' imprisonment for Count VI, 21 U.S.C. § 841(b)(1)(C).

21

months (Jorge), and 130 months (Henry).

Here, Swaine was not similarly situated with his codefendants, and the disparities between Swaine's sentences and those of his codefendants were not unwarranted for several reasons. First, the codefendants were not all convicted of the same offenses. Second, several of the codefendants received substantial assistance reductions for their cooperation with the government. Third, because there was abundant evidence that Swaine was the leader of the conspiracy, Swaine received a four-level role enhancement, which increased his advisory guidelines range from 121 to 151 months to 188 to 235 months. Finally, Swaine's codefendants pled guilty to some or all of the charges against them. Although Swaine contends that he was punished for exercising his constitutional right to a trial, the fact is that his codefendants were rewarded for their acceptance of responsibility.

Thus, because Swaine was not similarly situated with his codefendants who received lesser sentences, the district court's sentence did not conflict with the § 3553(a) factor of avoiding unwarranted sentence disparities. Furthermore, the district court imposed a sentence in the middle of the guidelines range due to the lack of aggravating or mitigating factors and stated that it was sufficient, but not greater than necessary. Swaine has failed to carry his burden to show that his 211-

22

month sentences were substantively unreasonable.

## III.  CONCLUSION

Based on the reasons above, we affirm Swaine's convictions and his 211-month sentences.

**AFFIRMED.**